UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| ERNEST EUGENE LEFFEW | PLAINTIFF |
| VERSUS | CIVIL ACTION NO. 1:19CV793-TBM-RPM |
| TROY PETERSON et al | DEFENDANTS |

## REPORT AND RECOMMENDATIONS

Plaintiff Ernest Eugene Leffew, proceeding *pro se* and *in forma pauperis*, filed a 42 U.S.C. § 1983 prisoner civil rights complaint alleging that Defendants, who are officials and employees of the Harrison County Adult Detention Center (HCADC), failed to protect him from an attack at the hands of another inmate. He also alleges failure to train and failure to supervise on the part of some of the Defendants. Plaintiff currently is housed in the Central Mississippi Correctional Facility; however, at the time of the incident, he was at HCADC to await proceedings on pending federal charges. Doc. [24] at 8. At the time of the subject incident, Plaintiff was serving time on state charges for armed robbery and kidnapping. *Id.* at 14. He eventually pleaded guilty to federal charges of larceny and aggravated identity theft. *Id.* at 13.

## Plaintiff's Complaint

In his complaint, Plaintiff alleges that on November 6, 2018, while at HCADC, he was assaulted by another prisoner, later identified as "Quinton Leboue". Doc. [1]. Plaintiff asserts that with proper training and supervision, his injuries could have been avoided. According to the grievance attached to Plaintiff's complaint, he requested to be moved off the zone to avoid a fight because he had words with Leboue. Doc. [1-1]. Plaintiff made this request to Defendant Sergeant Freeman, who threatened to mace Plaintiff if he did not get back on the zone. Shortly after his conversation with Defendant Freeman, Plaintiff attempted to "make peace" with

Leboue. His efforts were unsuccessful. Leboue struck Plaintiff in the face resulting in a broken eye socket and broken nose. After the assault, Plaintiff was taken to medical for x-rays. The next day, he was transported to the emergency room at Memorial Hospital and later hospitalized for treatment of his injuries.

**Hearing Testimony**

On September 22, 2020, the undersigned conducted a screening hearing to explore Plaintiff's claims in more detail. Plaintiff identified his assailant as inmate "Quinton Leboue".[1] Doc. [24] at 15. According to Plaintiff, he and Leboue had a long history of issues between them prior to the day of the incident. Leboue felt that Plaintiff had done him wrong. *Id.* at 8. Plaintiff testified that Leboue had been arrested on charges of lustful touching of a minor. *Id.* at 28. Plaintiff's girlfriend's daughter was friends with one of Leboue's victims. *Id.* at 28, 57. Plaintiff stated that he knew the little girl whom Leboue victimized. *Id.* At some point, Plaintiff made a couple of comments to Leboue and asked him "what was going on in [his] head" with respect to the alleged criminal acts. *Id.*

Plaintiff had been transferred back and forth to HCADC several times prior to the subject incident, and he indicated that he had problems with Leboue every time he returned to the jail. *Id.* at 8, 20, 25. On previous occasions at HCADC, Plaintiff and Leboue had "problems back and forth". *Id.* at 16. According to Plaintiff, everyone at the jail "knew the situation between [Plaintiff] and Leboue." *Id.* at 22, 56-57. They almost came to blows six months before the subject incident. *Id.* at 16. He stated that on two previous occasions he and Leboue "had almost

---

[1] The undersigned conducted a search of MDOC inmates and could not find an inmate by the name of "Quinton Leboue". Based on a review of MDOC records, it appears Plaintiff may be referring to an inmate named Quincy Lebauve,

gotten into a fight. . . arguing back and forth and everything else." *Id.* at 16, 20, 29. Officer Walton had to separate them during one previous altercation. *Id.* at 29.

Three weeks prior to the incident of November 6, 2018, the US Marshal Service brought Plaintiff back to HCADC to face federal charges. *Id.* at 8 15-17. When he was brought through booking, Plaintiff explained the "situation" to the classification officer and asked not to be housed with Leboue. *Id.* When the classification officer told the booking officer about Plaintiff's request, the booking officer said he would put Plaintiff wherever he had a bed. *Id.* at 17. Plaintiff also submitted multiple kiosk requests asking to be moved. *Id.* at 9, 20-21. According to Plaintiff, he sent requests to be moved "at least ten times a day for the first week and a half." *Id.* at 21. At one point, he asked to be put in "the hole" to avoid being placed with Leboue. *Id.* at 11-12. He tried putting a "keep-away order" on Leboue. *Id.* at 17.

Plaintiff spoke to Defendant Elaine Lege about his issues with Leboue. In fact, Plaintiff made so many requests to be moved that Defendant Lege eventually came down to the block and told him to quit putting in requests, because he was not going to be moved. *Id.* at 22. He told her that every time he comes back to HCADC, he has "some kind of argument" with Leboue. *Id.* at 25. He felt that an altercation was imminent, because Leboue had "just gotten his state time, . . . he didn't have nothing to worry about as far as any more time." *Id.* According to Plaintiff, Leboue had warned him, "you better hope and pray that I get out of here because if I see you up the road, I'm going to do this to you and I'm going to do that to you, and you come back here, you better be ready." *Id.*

According to Plaintiff, as soon as he got to the block at HCADC, the other inmates "start hollering, hey, Ernie is back, Ernie is back." *Id.* at 19. Then Leboue yelled, "hey, I got you tomorrow." *Id.* At one point, Plaintiff asked Defendant Freeman to be moved, "[a]nd [Freeman]

3

point blank told me, he said, I ain't moving you unless you in the heap of blood and then we'll come in and carry you down to medical." *Id.* at 22. According to Plaintiff, HCADC personnel "all knew the situation between [him] and Leboue." *Id.* He told correctional officer Ruiz that "if they don't move me I'm going to get jumped by [Leboue]." *Id.* at 23. He testified that he told everyone about the situation and that he needed to be separated from Leboue. *Id.* at 25, 31. He spoke personally to Defendant Lege and told her that every time Plaintiff came back to HCADC, he and Leboue would get into an argument. *Id.* Plaintiff says that, prior to the November 6, 2018, incident, he told everyone at the jail that his life was in danger and that if he did not get out of the situation, "something was going to happen." *Id.* at 56.

On the day of the incident, Plaintiff stepped outside the block to speak to Defendant Freeman. *Id.* at 10. He asked to be moved before something happens. *Id.* In response, Freeman threatened to mace Plaintiff if he did not go back to the zone. *Id.* Plaintiff then attempted to talk to Leboue and work things out between them, but Leboue sucker punched him causing severe injuries to Plaintiff's eye and nose. *Id.* at 10-11.

Plaintiff testified that he spoke directly to Defendant McCabe about the situation during a previous stay at HCADC. *Id.* at 26. He communicated indirectly with McCabe, through Defendant Freeman, on the day of the incident, shortly before the attack. *Id.* at 27. With respect to Defendant Warden Evan Hubbard, Plaintiff did not speak directly to him but sent messages on the kiosk explaining the situation and asking to be moved. *Id.* at 31. Likewise, Plaintiff did not speak directly with Sheriff Troy Peterson, but he sent him numerous requests explaining the situation with Leboue. *Id.*

In his grievance, Plaintiff indicated that he asked Defendant Freeman to move him because he "had words" with another inmate. Doc. [1-1]. At the hearing, Plaintiff clarified this

4

statement and testified that Defendant Freeman "knew who the inmate was, he knew what the words were. I didn't go into detail about all that. Yeah, I just said we had been having words." Doc. [24] at 48. During the investigation into the incident, Plaintiff initially reported that he had slipped and fallen in the shower, which caused the injuries. At the hearing, Plaintiff explained that he made this apparently false statement because he did not want the other inmates thinking he was a snitch. *Id.* at 54.

Defendants have filed a motion for summary judgment arguing that Plaintiff fails to state a constitutional claim. They also assert their entitlement to qualified immunity. Doc. [29]. Defendants further argue that Plaintiff fails to state a claim against them in their official capacities. Plaintiff has not filed a response in opposition to the motion for summary judgment.

## Law and Analysis

### Standard of Review

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). Where the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, all other contested issues of fact are rendered immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Topalin v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992). In making its determinations of fact on a motion for summary judgment, the court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of a material fact and the appropriateness of judgment as a matter of law to prevail on its motion. *Union Planters Nat'l Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131. "Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John v. State of Louisiana*, 757 F.3d 698, 708 (5th Cir. 1985). Once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. Nat'l Broad. Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978).

**Failure to Protect**

Defendants assert that they are entitled to qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

The Supreme Court directs courts to employ a two-step sequence in evaluating whether government officials are entitled to qualified immunity claims. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated

6

a constitutional right? This must be the initial inquiry." *Id.* Second, if the plaintiff has satisfied the first step, courts are required to decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* With respect to the second step, the Fifth Circuit has held that "a state actor is entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *Id*.

Plaintiff asserts that Defendants failed to protect him from attack by inmate Leboue. Prison officials have a constitutional duty to protect inmates from violence at the hands of their fellow inmates. *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006). However, prison officials are not expected to prevent all inmate-on-inmate violence. *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003). An inmate "must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that prison officials were deliberately indifferent to the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). An official acts with the requisite deliberate indifference if he is aware of an "excessive risk to inmate . . . safety" and disregards that risk. *Id.* at 837. An officer's awareness of the risk is evaluated subjectively. *Longoria*, 473 F.3d at 592-93. A prison official knows of an excessive risk only if (1) he is aware of facts from which he could infer that a substantial risk of serious harm exists, and (2) he in fact draws the inference. *Id.* at 593. The plaintiff may rely on circumstantial evidence indicating that because the risk was obvious, the official must have known of the risk to the inmate. *Adames*, 331 F.3d at 512. Generalized threats of violence do not by themselves state a claim for failure to protect. *See Farmer*, 511 U.S. at 858–59 (Thomas, J., concurring)

7

(recognizing that "[p]risons are necessarily-dangerous places," which "house society's most antisocial and violent people in close proximity with one another," thereby making it inevitable that "some level of brutality ... among prisoners" may occur); *Foxx v. State of Mississippi*, No. 1:17cv61-LG-RHW, 2019 WL 2998570, at *3 (S.D.Miss. June 5, 2019). No liability exists if an official reasonably responded to a known substantial risk, even if the harm was ultimately not averted. *Longoria*, F.3d at 593.

Viewing the evidence in the light most favorable to the Plaintiff, the undersigned concludes that summary judgment should be denied on the failure-to-protect claim with respect to Defendants Freeman, Lege, McCabe, Peterson, and Hubbard. Plaintiff testified that he told these Defendants about the "situation" between himself and Leboue prior to the attack of November 6, 2018. Although Plaintiff was somewhat vague about precisely what he told each of these Defendants, for purposes of summary judgment review, the undersigned assumes that the "situation" related by Plaintiff to Defendants included the history of conflict and arguments between Plaintiff and Leboue as related in Plaintiff's sworn testimony. This includes the history of conflict relating to Leboue's criminal charges; statements by Leboue threatening to commit acts of violence against Plaintiff; and two "almost fights" between them, one of which required a correctional officer to separate them. According to Plaintiff's testimony, Defendant Freeman knew everything about the situation between Plaintiff and Leboue prior to the incident; however, Defendant Freeman told Plaintiff he would not be moved "unless you in the heap of blood and then we'll come in and carry you down to medical." Doc. [24] at 22. Moreover, when Plaintiff asked to be moved just moments before the attack, Defendant Freeman threatened to mace Plaintiff if he did not return to the zone. *Id.* at 10, 51. With respect to Defendant McCabe, Plaintiff testified that he personally spoke to McCabe about the situation during a previous stay

8

at HCADC. *Id.* at 26-27. According to Plaintiff, McCabe "did know what was going on as far as the conflict between [Plaintiff] and Leboue." *Id.* at 26. On the day of the incident, McCabe was the lieutenant on duty. *Id.* After Freeman threatened to mace Plaintiff if he did not get back on the zone, Plaintiff asked to go up the chain of command and talk to the Lieutenant McCabe. In response, Freeman contacted McCabe who told Freeman "to tell [Plaintiff] to go back in there and quit crying and grow up." *Id.* at 26. Also, according to Plaintiff, Defendant Lege came and spoke with him personally in response to his numerous requests to be moved away from Leboue. Instead of separating him from Leboue, Defendant Lege told Plaintiff to quit putting in requests, because he was not going to be moved. *Id.* at 22, 25. Defendants have not submitted affidavits or other evidence denying their knowledge of the "situation" as described by Plaintiff prior to the incident. Plaintiff's sworn testimony creates a genuine issue of material fact on the issue whether Defendants Freeman, McCabe, and Lege were subjectively aware of a risk to Plaintiff's safety and whether they were deliberately indifferent to this risk by failing to take steps to separate him from Leboue.

Plaintiff's failure-to-protect claim against Defendants Peterson and Hubbard are in a slightly different posture because they were involved in an indirect, supervisory role. During the relevant time frame, Peterson was the Sheriff of Harrison County and Hubbard was the warden of the jail. Plaintiff stated that he did not speak directly with Defendant Peterson but sent "numerous requests, explaining the situation to him." Doc. [24] at 31. Plaintiff also stated that he did not speak directly with Defendant Hubbard, but he sent messages on the kiosk explaining the situation and asking to be moved. *Id.* According to Plaintiff, Peterson and Hubbard did nothing in response to his communications. Again, for purposes of summary judgment analysis, the undersigned assumes that prior to the November 6th incident, Defendants Peterson and

9

Hubbard were aware of the situation as described in Plaintiff's testimony, *i.e.*, Plaintiff's history with Leboue relating to Leboue's criminal charges, Leboue's threats of violence against Plaintiff, and prior arguments and near fights between Plaintiff and Leboue. Once on notice, these supervisory officials were obliged to take reasonable measures to protect Plaintiff from Leboue. *See Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004). Defendants have not provided affidavits or other summary-judgment evidence to explain what measures, if any, they took to protect Plaintiff.

In their memorandum brief, Defendants point out that prior to November 6, 2018, Plaintiff did not file any kind of grievance or report with HCADC accusing Leboue of physically assaulting him. Whether Plaintiff filed grievances or reports about Leboue goes to Plaintiff's credibility and the weight of the evidence, but in the face of Plaintiff's sworn testimony, it is not sufficient to entitle Defendants to summary judgment on this claim. Although he may not have filed a report or grievance regarding any specific episode of physical violence, Plaintiff testified that he frequently alerted Defendants to issues with Leboue. Defendants also argue that Plaintiff had no history of physical altercations with Leboue. Plaintiff's testimony suggests that there was a history of near physical altercations, including one that required a correctional officer to intervene. Plaintiff also testified about verbal threats of violence made against him by Leboue prior to the incident. For purposes of summary-judgment analysis, the Court assumes that these facts were transmitted to Defendants when Plaintiff told them about the "situation".

With respect to the four unnamed members of the Emergency Response Team, Plaintiff acknowledged that they did not know about the "situation" involving Leboue until after the attack had occurred. Doc. [24] at 30-31. The ERT responded to the attack after it had occurred.

*Id.* Plaintiff admitted they did nothing wrong prior to the altercation. *Id.* Accordingly, these Defendants should be dismissed with prejudice.

**Official Capacity**

To the extent Plaintiff asserts claims against Defendants in their official capacities, these claims should be dismissed. "Official capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent." *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999). "For purposes of liability, a suit against a public official in his official capacity is in effect a suit against the local government entity he represents." *Mairena v. Foti*, 816 F.2d 1061, 1064 (5th Cir. 1987). For a local governmental entity to have liability under Section 1983, a plaintiff must prove that a policy, custom, or practice of that local government entity was the "moving force" behind the constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Specifically, the plaintiff must show the existence of a policy, practice, or custom "adopted or maintained with objective deliberate indifference to [his] constitutional rights," and he must show that such policy proximately caused the constitutional deprivation of which he complains. *See Grabowski v. Jackson County Pub. Defenders Office*, 79 F.3d 478, 479 (5th Cir.1996). For a municipality to be liable for such a custom or practice, "[a]ctual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Mahoney v. City of Jackson*, 3:07cv173–DPJ–JCS, 2008 WL 2990906, at *2 (S.D.Miss. July 25, 2008) (quoting *Webster*, 735 F.2d at 841). Plaintiff has failed to identify any policy, custom, or practice that resulted in the alleged constitutional deprivation. Accordingly, his complaint fails with respect to any official capacity claims.

**Failure to Train and Supervise**

Plaintiff alleges a claim for failure to train and/or supervise. To demonstrate failure to train and/or supervise Plaintiff must demonstrate that "1) the supervisor either failed to supervise or train the subordinate official, 2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights, and 3) the failure to train or supervise amounts to deliberate indifference." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011). In order to establish deliberate indifference, plaintiffs "usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and likely to result in a constitutional violation." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)). "[M]ere proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005).

In his complaint, Plaintiff asserts that with proper training and supervision, the attack by Leboue would not have occurred. When asked to elaborate on these claims at the screening hearing, Plaintiff merely stated that Sheriff Peterson is the policy maker in charge of HCADC; therefore, he is in charge of training. Doc. [24] at 33-34. He suggests that additional "sensitivity training" or "updated investigation skills" might have prevented the attack. *Id.* Other than these vague and conclusory statements, Plaintiff has offered no factual allegations to support his claims for failure to train and/or supervise. As such, these claims should be dismissed.

## RECOMMENDATION

Based on the foregoing, the undersigned recommends that Defendants' [29] Motion for Summary Judgment be GRANTED in part and DENIED in part, such that Plaintiff's failure-to-protect claim against Defendants Freeman, Lege, McCabe, Hubbard, and Peterson be allowed to

proceed. The undersigned further recommends that Plaintiff's claims against the "4 Members of ERT Team" be dismissed with prejudice and that Plaintiff's claims for failure to train and/or supervise be dismissed with prejudice.

## **NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions and recommendations to which objections are being made; the District Court need not consider frivolous, conclusive or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the District Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions and recommendation contained in this report shall bar that party from a de novo determination by the District Court. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions that have been accepted by the district court and for which there is no written objection. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

SO ORDERED AND ADJUDGED, this the 23rd day of June 2021.

/s/ *Robert P. Myers, Jr.*
ROBERT P. MYERS, JR.
UNITED STATES MAGISTRATE JUDGE