IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**ERNEST EUGENE LEFFEW, #186927**                                                        **PLAINTIFF**

v.                                              CIVIL ACTION NO. 1:19-cv-793-TBM-RPM

**SHERIFF TROY PETERSON, WARDEN
EVAN HUBBARD, CAPTAIN ELAINE
LEGE, LIEUTENANT ZACHARY
MCCABE, TRENTON FREEMAN, and
FOUR MEMBERS OF EMERGENCY
RESPONSE TEAM**                                                                              **DEFENDANTS**

**OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION,
GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, AND DISMISSING
CLAIMS AGAINST REMAINING DEFENDANTS**

Before the Court is the Report and Recommendation [33] entered by United States Magistrate Judge Robert P. Myers on June 23, 2021. Judge Myers recommends that the Motion for Summary Judgment and Immunity on Behalf of Defendants [29] be granted in part because the movants (Troy Peterson, Evan Hubbard, Elaine Lege, Zachary McCabe, and Trenton Freeman) are entitled to qualified immunity in their *official* capacities concerning pro se Plaintiff Leffew's Eighth Amendment claims, and because Plaintiff has not offered factual allegations to support his claims for failure to train and/or supervise. Judge Myers recommends the Motion [29] be denied in part because the movants are not entitled to qualified immunity in their *individual* capacities concerning Leffew's claims. In addition, Judge Myers recommends that Leffew's claims against the unnamed, Defendant Members of the Emergency Response Team be dismissed with prejudice because Leffew has conceded those claims.

No parties have filed objections to the Report and Recommendation, and the deadline for filing objections has expired. Namely, Defendants have not objected to the Report and

Recommendation denying summary judgment in part, and Plaintiff has not objected to the Report and Recommendation granting summary judgment in part and dismissing the remaining Defendants (Four ERT Members). "When a party fails timely to file written objections to the magistrate judge's proposed findings, conclusions, and recommendation, that party is barred from attacking on appeal the unobjected-to proposed findings and conclusions which the district court accepted, except for plain error." *Casas v. Aduddell*, 404 F. App'x 879, 881 (5th Cir. 2010); *see also Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting § 636(b)(1)(C), intended to require a district judge to review a magistrate's report to which no objections are filed."). The Court has considered Judge Myers' Report and Recommendation, and it finds that the Report is neither "clearly erroneous" nor "contrary to law." Fed. R. Civ. P. 72(a); *see Nw. Indep. Sch. Dist.*, 689 F. App'x at 783 (explaining that when "a district court adopts the report and recommendation after no objection was made," the appellate court will review "only for plain error") (citing *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds,* 28 U.S.C. § 636(b)(1)).

The Court does find, however, that additional caselaw and analysis is needed to support Judge Myers' recommendation concerning the denial of summary judgment, and it has supplemented the Report and Recommendation accordingly below.[1]

## I. STANDARD OF REVIEW

The qualified immunity standard "involves significant departures from the norms of civil litigation—particularly summary-judgment norms." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981

---

[1] The Court will not restate facts in this supplemental opinion that the Magistrate Judge has already thoroughly discussed and analyzed in his Report and Recommendation [33]. Instead, the Court will touch on relevant facts when necessary for legal analysis and will, otherwise, simply cite to the portion of the Report and Recommendation where such factual discussion can be found.

F.3d 319, 328–29 (5th Cir. 2020). "Qualified immunity changes the nature of the summary-judgment burden, how and when the burden shifts, and what it takes to satisfy the burden." *Joseph on behalf of Est. of Joseph*, 981 F.3d at 329. When a plaintiff sues for a constitutional violation, he has "the ultimate burden to show that the defendant violated a constitutional right." *Id.* But when the qualified immunity defense is pled, the plaintiff has "the *additional* burden to show that the violated right was 'clearly established' at the time of the alleged violation." *Id.* (emphasis added).

Once the defendant makes "a good-faith assertion of qualified immunity," the summary judgment burden of proof shifts to the plaintiff, who "must show that the defense is not available." *Id.* at 329-30. "The plaintiff must show that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury." *Id.* at 330. Qualified immunity "similarly changes the court's normal task on summary judgment." *Id.* As expected, the court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in its favor. *Id.* But the court must also determine whether the plaintiff can prove a constitutional violation *that was clearly established. Id.* And "[t]he contours of the rights must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016). As explained by the Supreme Court, the doctrine of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

In sum, "evaluating qualified immunity is a two-step process, and the burden is on the plaintiff to prove that a government official is not entitled to qualified immunity." *Wyatt v. Fletcher*, 718 F.3d 496, 502–03 (5th Cir. 2013). The first step is to "determine whether the plaintiff has

alleged a violation of a clearly established constitutional or statutory right," and "the second step is to determine whether the defendant's conduct was objectively reasonable." *Id.* "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. City of Corpus Christi,* 202 F.3d 730, 736 (5th Cir. 2000). Of note, "[b]oth steps in the qualified immunity analysis are questions of law." *Wyatt*, 718 F.3d at 502–03.

## II. QUALIFIED IMMUNITY ANALYSIS: EIGHTH AMENDMENT FAILURE TO PROTECT

Relevant to Defendants' Motion for Summary Judgment, Leffew (proceeding pro se) has sued five officials of the Harrison County Sherriff's Office: the sheriff, the warden, a captain, a lieutenant, and a sergeant. Leffew alleges that these prison officials are liable for failing to protect him from being attacked by another inmate, known to the Court as "Quinton Leboue." The attack at issue occurred on November 6, 2018 at the Harrison County Adult Detention Center (HCADC), where Leffew was being held to await proceedings on federal charges. Leboue violently struck Leffew in the face with such force that the blow broke Leffew's eye socket and nose. Leffew underwent emergency surgery and was hospitalized for further treatment. In pursing his claims against the Defendants, Leffew advises that he had a known antagonistic history with Leboue, and Leffew alleges that he made numerous requests to Defendants asking to be moved away from Leboue because he feared for his safety.

Looking first to the constitutional violation alleged by Leffew: there is no doubt that—at the time of the conduct at issue—it was "well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates." *Longoria v. Texas*, 473 F.3d 586, 592–93 (5th Cir. 2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 832–33, 114 S. Ct.

1970, 1976–77, 128 L. Ed. 2d 811 (1994)). In *Farmer*, the Supreme Court observed that having confined potentially "violent" persons together, "stripped [them] of virtually every means of self-protection, and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer,* 511 U.S. at 833 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984)). The Supreme Court further explained:

> Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with "evolving standards of decency[.]" Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.

*Id.* at 834 (internal quotations and citations omitted).

Because "the obligation of prison officials to protect prisoners from violence at the hand of other inmates is clear," the Court "will proceed directly to consider whether [Leffew] has alleged a substantial risk of serious harm of which [the Defendants] w[ere] deliberately indifferent." *Morgan v. Hubert*, 335 F. App'x 466, 471 (5th Cir. 2009). Relying on *Farmer,* the Fifth Circuit explains how this analysis works:

> [A]n inmate "must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that prison officials were deliberately indifferent to [his] safety. An official acts with the requisite deliberate indifference if he is aware of an "excessive risk to inmate . . . safety" and disregards that risk. In this context, an officer's awareness of the risk is evaluated subjectively. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and must in fact also have drawn the inference. No liability exists, however, if an official reasonably responded to a known substantial risk, "even if the harm was ultimately not averted."

*Longoria,* 473 F.3d at 586 (quoting *Farmer,* 511 U.S. at 832–33). Of note, "'[d]eliberate indifference is an extremely high standard to meet.' The standard 'requires a showing of more than negligence

or even gross negligence.' Consequently, '[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference.'" *Leal v. Wiles*, 734 F. App'x 905, 909–10 (5th Cir. 2018) (holding that officer was entitled to qualified immunity because "[n]o direct evidence indicate[d] that [the officer] knew of [plaintiff's] protected status prior to his assault.").

For purposes of qualified immunity, "[t]he law can be clearly established *even without prior cases that are on all fours with the present case*, 'so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Johnson v. Johnson*, 385 F.3d 503, 524–25 (5th Cir. 2004) (emphasis added) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987); *Hope v. Pelzer,* 536 U.S. 730, 740, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)). Accordingly, the Court reviews caselaw (prior to the conduct alleged by Leffew) concerning prisoners who suffered injury at the hands of fellow inmates and who had previously advised prison officials of relevant threats to their safety and requested to be relocated to avoid the danger.

In 2003, the Fifth Circuit considered the dismissal of a case involving a plaintiff prisoner who alleged that inmates threatened his safety, that these threats were communicated to defendants, that plaintiff repeatedly requested to be transferred to another unit, and that plaintiff was ultimately assaulted by a gang member. *Edmond v. Eaves*, 70 F. App'x 159, 160 (5th Cir. 2003). The Court of Appeals vacated the dismissal and remanded for further proceedings, noting that "[a] prison official may not escape liability in a failure-to-protect claim 'by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant

was especially likely to be assaulted by the specific prisoner who eventually committed the assault.'" *Id.* (quoting *Farmer,* 511 U.S. at 843).

The following year, the Fifth Circuit considered qualified immunity in a case where a plaintiff prisoner alleged that "prison officials failed to protect [him] from prison gangs who repeatedly raped him and bought and sold him as a sexual slave." *Johnson v. Johnson*, 385 F.3d 503, 512 (5th Cir. 2004). The Court of Appeals found that some defendant prison officials were entitled to qualified immunity, while others were not. In finding that the "supervisory" defendants were entitled to qualified immunity, the court explained that they had "reasonabl[y] discharge[d] their duty to protect [the plaintiff]." *Johnson*, 385 F.3d at 526. The record showed that these defendants "had notice of [plaintiff's] plight through various letters and life-endangerment forms" and that they "responded to [plaintiff's] complaints by referring the matter for further investigation or taking similar administrative steps." *Id.* According to the Court, "[t]his was a reasonable discharge of their duty to protect the inmates in their care." *Id.* ("Like all prison officials, [the supervisory defendants] have a duty to take reasonable measures to protect inmates. Yet given the size of the operation that they oversee, they cannot be expected to intervene personally in response to every inmate letter they receive.").

In considering the defendant members of the Unit Classification Committee (UCC) who "did nothing in response to [the plaintiff's] claims except (according to [plaintiff]) tell him to fight off his attackers, despite the [defendants'] awareness . . . of the substantial risk that [plaintiff] faced," the Fifth Circuit noted, "it is not clear exactly what type of action an official is legally required to take." *Id.* at 527. But the court clarified that "the Supreme Court's opinion [in *Farmer*] does make it abundantly clear that an official may not simply send the inmate into the general

-7-

population to fight off attackers." *Id.* (citing *Farmer*, 511 U.S. at 832–33). The court found that the UCC defendants were "deliberately indifferent" in "fail[ing] to take any action into a reasonable method of discharging their duty to protect the prisoners in their care." *Id.* at 526–27. Accordingly, it affirmed the district court's denial of qualified immunity as to these defendants. *Id.*

In 2006, a district court in the Eastern District of Texas considered a case that shares factual similarities to the one currently before the Court and found that certain prison officials were not entitled to qualified immunity. *Moore v. Cockrell*, No. 6:03CV82, 2006 WL 6198592, at *15 (E.D. Tex. Feb. 11, 2006), *rev'd sub nom. Moore v. Lightfoot*, 286 F. App'x 844 (5th Cir. 2008). In *Cockrell*, the prisoner plaintiff was attacked by another inmate after plaintiff made numerous (unsuccessful) attempts to be transferred, complaining that he feared for his safety. *Lightfoot,* 286 F. App'x 844. He sued the chairman of the Unit Classification Committee (UCC) and a member of the State Classification Committee (SCC), asserting that they violated his Eighth Amendment rights. Plaintiff alleged that the SCC member "violated his clearly established Eighth Amendment rights by twice disregarding UCC recommendations to transfer him" and then "directing him to be placed back into general population with his would-be attacker." *Id.* at 848. Plaintiff alleged that the UCC chairman "violated his clearly established Eighth Amendment rights because . . . [the chairman] twice voted to return Moore to general population despite knowing that Moore faced a serious risk of substantial harm there." *Id.* at 849.

In *Lightfoot*, the Fifth Circuit reversed the denial of qualified immunity in *Cockrell*, but its reversal was based solely on the second prong of qualified immunity. *Id.* at 848. In order words, the Fifth Circuit found that the prison officials were entitled to qualified immunity because their actions were "objectively reasonable in light of clearly established law"—not because the plaintiff

failed to allege a clearly established constitutional right. The Fifth Circuit explained this finding by noting that the defendants—unlike the present Defendants—did, in fact, take some measures to protect the plaintiff from danger and provided explanations for refusing to transfer the plaintiff. *Id.* at 849-50.

For example, the SCC member defendant considered the plaintiff's transfer request but decided on an alternative plan for providing protection. He elected to transfer one of the inmates who posed a danger to plaintiff and explained this choice by saying that "it was logistically simpler to move [the harasser] rather than all the [inmates, in addition to the plaintiff, that he was] allegedly harassing." *Id.* at 848. The SCC defendant also explained that the inmate he transferred was "the leader of the gang" harassing inmates, and he "hoped that his transfer would discourage other members of the gang and end the matter." *Id*. Finally, the SCC defendant's second denial of plaintiff's transfer request occurred *after* the SCC had transferred four additional harassers away from plaintiff (as well as other victims of their harassment). *Id.* According to the Fifth Circuit, the SCC defendant's "actions—although ultimately unsuccessful—'may well have been reasonable methods of addressing the risk that [plaintiff] faced.'" *Id.* at 848–49 (quoting *Johnson v. Johnson,* 385 F.3d 503, 526 (5th Cir. 2004)) (citing *Hare v. City of Corinth,* 135 F.3d 320, 328–29 (5th Cir. 1998)).

The UCC chairman defendant likewise took some measures to address plaintiff's concerns. In response to plaintiff's first life-endangerment claim, the chairman voted to place plaintiff in transient housing, and he recommended that plaintiff be transferred. *Id.* at 849. Although the chairman subsequently voted (twice) to return plaintiff to general population, he only did so after the SCC decided to transfer the gang leader, and then after the four other threatening inmates were

transferred. *Id.* The Fifth Circuit concluded that "such a response may very well have been reasonable, and clearly established law did not indicate that it was objectively unreasonable." *Id.*

The Court finds that prior decisions from this Circuit gave "reasonable warning" to the Defendants that they could be liable for failing to take *any* measures to protect a prisoner who repeatedly claimed he was in danger of being assaulted by another prisoner. To succeed on his claim, then, Leffew must show that each prison official Defendant was subjectively "aware of an excessive risk to [Leffew's] safety" and chose to "disregard that risk." *Longoria v. Texas*, 473 F.3d 586 (5th Cir. 2006). Critically, if any of the Defendants "reasonably responded to a known substantial risk," he or she cannot be held liable for Leffew's injuries. *Longoria*, 473 F.3d at 586.

### A. Substantial Risk of Serious Harm to Plaintiff

Magistrate Judge Myers conducted a screening hearing prior to Defendants' filing of their Motion for Summary Judgment "to explore Plaintiff's claims in more detail." [33] pg. 2. In his Report and Recommendation, Judge Myers discussed Leffew's hearing testimony at length and relayed numerous factual allegations indicating that Leffew was "incarcerated under conditions posing a substantial risk of serious harm." [33] pgs. 2-5.

### B. Defendants' Knowledge of, and Response to, Substantial Risk of Serious Harm

Significant to the present analysis, "[t]o violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind,'" and "[i]n prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L. Ed. 2d 811 (1994). Each defendant's "state of mind must be examined to determine whether the undue hardship endured by the prisoner was a result of the [particular] prison official's deliberate indifference." *Bradley v.*

*Puckett*, 157 F.3d 1022, 1025–26 (5th Cir. 1998) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). Under the test adopted by the Supreme Court in *Farmer*, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. . . ." *Farmer*, 511 U.S. at 842–43.

In asking the Court to dismiss the claims against them, Defendants state: "[T]here is no evidence to support that the Defendants acted deliberately indifferent to the rights of the Plaintiff[,] and there is no evidence that these Defendants knew of and disregarded a substantial risk of serious harm to the Plaintiff." [30] pg. 6. As discussed below, this broad assertion is inaccurate and unavailing. Magistrate Judge Myers has provided a detailed account of Leffew's allegations in his Report and Recommendation concerning Leffew's failure-to-protect claim. The Court looks at those allegations as to each Defendant, in turn.

### i. Captain Elaine Lege

"Plaintiff [] submitted multiple kiosk requests asking to be moved [away from Leboue]. According to Plaintiff, he sent requests to be moved 'at least ten times a day for the first week and a half.'" [33] pg. 3. "Plaintiff made so many requests to be moved that Defendant Lege eventually came down to the block and told him to quit putting in requests, because he was not going to be moved." [33] pg. 3. "He spoke personally to Defendant Lege and told her that every time Plaintiff came back to HCADC, he and Leboue would get into an argument." [33] pg. 4.

Defendants acknowledge that "Plaintiff stated he spoke with Elaine Lege on one occasion"—nothing more. [30] pg. 3. In moving for summary judgment, Defendants ignore

Leffew's allegations regarding the kiosk machine as well as Leffew's claim that Defendant Lege ordered him to stop putting in requests.

### ii. Lieutenant Zachary McCabe

"According to Plaintiff, McCabe 'did know what was going on as far as the conflict between [Plaintiff] and Leboue.'" [33] pg. 9. "Plaintiff testified that he spoke directly to Defendant McCabe about the situation during a previous stay at HCADC. He communicated indirectly with McCabe, through Defendant Freeman, on the day of the incident, shortly before the attack." [33] pgs. 4. "On the day of the incident, McCabe was the lieutenant on duty. After Freeman threatened to mace Plaintiff if he did not get back on the zone, Plaintiff asked to go up the chain of command and talk to the Lieutenant McCabe. In response, Freeman contacted McCabe who told Freeman 'to tell [Plaintiff] to go back in there and quit crying and grow up.'" [33] 8-9.

Defendants say that "Plaintiff testified he did not have any conversations with Defendant McCabe" during his three-week stay at HCADC immediately preceding the attack. [30] pg. 3. Yet they fail to address what Leffew *did* say about his communications with McCabe—namely, that he spoke to McCabe about his concerns during a previous stay at HCDAC and that Leffew had indirect communication with McCabe on the day of the incident through Defendant Freeman. *See Farmer v. Brennan*, 511 U.S. 825, 842–43, 114 S. Ct. 1970, 1981–82, 128 L. Ed. 2d 811 (1994) ("[I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be

sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.").

### iii.  Sergeant Trenton Freeman

"According to Plaintiff's testimony, Defendant Freeman knew everything about the situation between Plaintiff and Leboue prior to the incident; however, Defendant Freeman told Plaintiff he would not be moved 'unless you in the heap of blood and then we'll come in and carry you down to medical.'" [33] pg. 8. "On the day of the incident, Plaintiff stepped outside the block to speak to Defendant Freeman. He asked to be moved before something happens. In response, Freeman threatened to mace Plaintiff if he did not go back to the zone. Plaintiff then attempted to talk to Leboue and work things out between them, but Leboue sucker punched him causing severe injuries to Plaintiff's eye and nose." [33] pg. 4.

Defendants' repeated assertion that "[t]he Plaintiff testified that during the current stay when the incident occurred with inmate Leboue he did not tell Defendant Freeman to keep him away from inmate Leboue"—alone—does nothing to address the claims articulated by Leffew concerning Freeman.

### iv.  The Supervisory Defendants

Leffew admits that he did not speak directly to Warden Even Hubbard and Sheriff Troy Peterson, but he says that *he sent messages to them on the kiosk* explaining the situation with Leboue and asking to be moved. [33] pgs. 4, 9-10. Again, the Defendants make no mention of these kiosk messages, despite Leffew's apparent claim that he submitted approximately 100 requests to be moved via the kiosk machine. The Court, on summary judgment, views the facts in the light most favorable to Leffew. At this stage, the Court must recognize the message requests were sent to

Warden Hubbard and Sherriff Peterson, and it notes that Defendants have offered no argument to the contrary.

In sum, the Defendants who did "respond" to Leffew's request for protection responded as follows: Defendant Sergeant Freeman told Leffew he wouldn't move him unless he was in a heap of blood at which point Leffew would be carried down to medical. Defendant Captain Lege told Leffew to quit putting in requests to be moved because it wasn't going to happen. On the day of the attack, Defendant Freeman threatened to mace Leffew after he asked to be moved "off the zone" to avoid his assailant. When Leffew asked Defendant Freeman to go up the chain to Defendant Lieutenant McCabe, Defendant Freeman reported back to Leffew that Defendant McCabe said to tell Leffew to quit crying and grow up.

The Defendants offer no explanation for refusing to relocate Leffew after he made persistent complaints that he feared for his safety. And Defendants have provided no facts to suggest they made any alternative efforts whatsoever to protect him from the harm he feared or even to investigate his claim. As noted, the Supreme Court has "ma[d]e it abundantly clear that an official may not simply send [an] inmate into the general population to fight off attackers." *Johnson v. Johnson*, 385 F.3d 503, 526 (5th Cir. 2004). And prison officials are not entitled to qualified immunity when they "refuse[] to verify underlying facts that [they] strongly suspected to be true, or decline[] to confirm inferences of risk that [they] strongly suspected to exist." *Farmer v. Brennan*, 511 U.S. 825, 843 n. 8, 114 S. Ct. 1970, 1982, 128 L. Ed. 2d 811 (1994) (e.g., "as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation"). A question of fact exists

as to whether Defendants' actions were objectively unreasonable and deliberately indifferent. Therefore, partial denial of summary judgment is merited.

That said, the Court recognizes that there may well be facts that would indicate summary judgment *is* appropriate as to some (or all) of these Defendants in their individual capacities. Such facts, however, are not in the record, and the Court cannot infer them. Instead, it is obliged to consider the facts in the light most favorable to the Plaintiff. Although the dispositive motions' deadline has expired, the Court will allow the Defendants a finite period of time to refile motion(s) for summary judgment. If any Defendants choose to refile, he or she should present facts indicating that (1) there was *not* a substantial risk to Leffew's safety, (2) the particular Defendant did not *know* of a substantial risk, or (3) the Defendant was not deliberately indifferent to a known risk or he/she responded reasonably to a known risk. *See Hinojosa v. Livingston*, 807 F.3d 657, 672 (5th Cir. 2015) (quoting *Morgan v. Hubert,* 335 F. App'x 466, 473 (5th Cir. 2009)) ("[W]e have observed that '[a]dditional facts . . . are particularly important when evaluating the [reasonableness] prong of the qualified immunity test.' That holds true in this case. The district court did not err in determining that factual development was needed to rule on Defendants' qualified immunity defense.").

### III. CONCLUSION

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Report and Recommendation [33] entered by United States Magistrate Judge Robert P. Myers is ADOPTED as the opinion of the Court.

IT IS, FURTHER, ORDERED AND ADJUDGED that the Motion for Summary Judgment and Immunity on Behalf of Defendants [29] is GRANTED IN PART, and all of

Plaintiff's official capacity claims, to the extent they are pled, and his claims for failure to train and/or supervise are DISMISSED WITH PREJUDICE.

IT IS, FURTHER, ORDERED AND ADJUDGED that the Motion for Summary Judgment and Immunity on Behalf of Defendants [29] is DENIED IN PART WITHOUT PREJUDICE, and Defendants will have until August 20, 2021 to refile any Motions for Summary Judgment as described above on the basis of qualified immunity.

IT IS, FURTHER, ORDERED AND ADJUDGED that the Plaintiff's claims against the Four Unnamed Members of the Emergency Response Team are DISMISSED WITH PREJUDICE.

SO ORDERED AND ADJUDGED, this the 28th day of July, 2021.

_____
TAYLOR B. MCNEEL
UNITED STATES DISTRICT JUDGE